**James F. FOLSOM, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A.03–23870KHV.**

United States District Court, D. Kansas.

March 18, 2004.

Joan H. Deans, Deans Law Office, Raytown, MO, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

James F. Folsom brings suit under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Commissioner's decision to deny disability benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the SSA, 42 U.S.C. §§ 1381 *et seq.*[1] This matter is before the Court on plaintiff's *Motion For Judgment* (Doc. # 5) filed November 13, 2003. For reasons stated below, the Court sustains plaintiff's motion in part.

## I. Procedural Background

On July 5, 2000, plaintiff filed applications for SSI and disability insurance benefits, claiming that he was disabled beginning July 5, 1999. On July 30, 2002, an Administrative Law Judge ("ALJ") conducted an evidentiary hearing regarding plaintiff's claim. Tr. 24–68. On March 11, 2003, the ALJ found that plaintiff was not disabled. Tr. 14–23. The Appeals Council denied plaintiff's request for review. Tr. 6–8.

## II. Factual Evidence

### A. Plaintiff's Testimony

Plaintiff testified to the following facts.

Plaintiff is 45 years old. Tr. 32. He completed high school, served in the military and worked in the construction industry. Tr. 33, 62. Plaintiff is legally blind in his right eye but can see out of his left eye with glasses. Tr. 38.

In April of 1998, a front end-loader bucket hit plaintiff on the head while he was building a fence. Tr. 52, 61, 108. At the time of the accident, plaintiff was working as an independent contractor. Tr. 46. Plaintiff did not seek medical attention after the accident.[2] Tr. 61.

After the accident, plaintiff began having seizures and problems with concentration. Tr. 39. Plaintiff continued to work for a while but stopped when he became afraid to drive because of seizures. Tr. 47. As of July 1, 1999, the date on which plaintiff claims his disability began, plaintiff was trying to work but he could only do so every fourth day because of pain.[3] Tr. 46. After working one day, plaintiff would hurt so bad that he would have to take three days off before he could work again. *Id.*

Plaintiff has a lot of pain in his hips, knees and lower back when he tries to walk or stand up. Tr. 33–34. In addition, if he sits in one position too long he has burning pain in the middle of his shoulder blades, lower back and hips. Tr. 34–35. Plaintiff believes that he can stand about 30 minutes at a time and walk about 50 yards. Plaintiff estimates that he can sit for a couple of hours if the chair is wide enough to shift positions. Tr. 35–36. He can lift ten pounds off a table, but not off the floor. Tr. 36–37. He experiences pain in his lower back when he bends over and pain in his knees if he squats. Tr. 37. Plaintiff's entire body feels weak because of pain. Tr. 40.

---

1. Two social security disability benefit programs are available: disability insurance for qualified individuals who paid social security taxes for the relevant period, and SSI for individuals who did not. The pertinent regulations are the same for both programs. *See Eads v. Sec'y of Dep't of HHS*, 983 F.2d 815, 816 (7th Cir.1993).

2. Plaintiff's wife testified to some of the facts in this paragraph. The Court includes them here to help with the chronology of events.

3. Plaintiff had experienced physical problems before the accident, but the seizures and problems with concentration started afterwards. Tr. 50.

Plaintiff lives in the country with his wife. Plaintiff sleeps about eight hours a night. He wakes up around 7:00 a.m., makes coffee, sits on the couch and watches television until noon. *Id.* During that time, he gets up to feed his dogs and cat and go to the bathroom. Tr. 40–41. Around noon, plaintiff usually goes outside to sit under a shade tree, where it is cooler than his house which is not air conditioned. Tr. 41. While outside, he drinks water, listens to birds and watches animals. *Id.* Plaintiff spends about three hours a week fishing on his pond. Tr. 41–42. Plaintiff does not do household chores or yard work. Tr. 43.

Plaintiff can sometimes tell when he is going to have a seizure, but he is not aware when he is experiencing it. Tr. 47. Plaintiff thinks that he has seizures a couple of times a day. Tr. 48. One minute he will be doing an activity in the house and the next thing he knows he is in a different place, like out in the yard. *Id.* He does not know how long the seizures last and he remembers nothing of the seizures themselves. Tr. 47–48. He normally does not have seizures when he is watching television or concentrating on something else. Tr. 48–49.

Plaintiff drives once in a while, but stays close to the house. Tr. 33. On weekends, plaintiff drives a couple of miles on gravel roads to visit friends. Tr. 42. He also drives to visit his nephew during the week. Tr. 43. Plaintiff does not drive to doctor appointments. *Id.* His wife or nephew usually takes him. *Id.*

Plaintiff walked into the hearing room with a cane. Tr. 45. He uses a cane to walk a lot and when his hips are bothering him, which is about half the time. *Id.* Plaintiff does not think that he can perform his past work because of pain and inability to drive to work due to seizures. Tr. 50.

**B. Plaintiff's Wife's Testimony**

Priscilla Folsom, plaintiff's wife, testified to the following facts.

Priscilla and plaintiff have been married 25 years. Tr. 52. Before the accident, Priscilla noticed that plaintiff had difficulty straightening when he stood up, but he was sharp mentally. Tr. 53. After the accident, plaintiff's physical condition deteriorated. After working one day, he would have to spend two or three days in bed because his body was not functioning correctly. *Id.* Also, plaintiff began having problems with his memory. Tr. 54. He did not remember when people called, so Priscilla had to get an answering machine. *Id.* Within three to six months after the accident, plaintiff began having moments when he could not remember where he was going or who he was. *Id.* After that, plaintiff began to limit his driving to within five miles of home. Tr. 55.

Priscilla observes plaintiff having seizures about three times a week. Tr. 60. During a seizure, plaintiff shakes and is incoherent. Tr. 58–59. The seizures last about two to five minutes. Tr. 59. Priscilla has to remind plaintiff to bathe and take medicine. Tr. 55–56.

**C. Medical Evidence**

Plaintiff receives all medical treatment from the Veterans Health Administration ("VA"). Tr. 33. On July 20, 2000, plaintiff visited VA primary care for chronic pain in his knees, neck and right shoulder. Tr. 200. Plaintiff also reported an injury to his right upper extremity which happened about a year ago. *Id.* Plaintiff described that he had trouble sleeping and depression as a result of pain and inability to work. *Id.* Tim Murray, M.D., staff physician, prescribed high doses of ibuprofen for chronic diffuse pain in large joints. Dr. Murray ordered films and screening

labs and recommended that plaintiff visit mental health for depression. *Id.*

On September 1, 2000, plaintiff returned to Dr. Murray for continued pain in his joints. Tr. 198–99. Plaintiff reported relief with Tylenol, but not ibuprofen. Dr. Murray advised plaintiff to continue taking Tylenol and to consult with rehabilitation in two weeks. *Id.* Dr. Murray also recommended a mental health appointment for depression. Tr. 199.

On September 12, 2000, plaintiff consulted with VA rehabilitation regarding shoulder, hip and knee pain. Tr. 184. Thy N. Huskey, M.D., staff physician in rehabilitation, noted that plaintiff had

[c]hronic pain involving right shoulder, bilateral hips and bilateral knees. The patient does have some findings of [possible] degenerative joint disease within the shoulder and the knees. The patient does have some finding particularly in his knee suggestive of degenerative joint disease.

Tr. 185. Dr. Huskey planned to wait for x-ray findings to evaluate plaintiff for degenerative joint disease and to re-evaluate plaintiff's right shoulder range of motion at his next visit. Dr. Huskey recommended that plaintiff continue taking Tylenol as needed.

On September 12, 2000, plaintiff had x-rays taken of his knees, lumbar spine, cervical spine and shoulders. Polina N. Kyriakides, M.D., staff radiologist, interpreted the results. With respect to the knees, Dr. Kyriakides found:

. . . a mild narrowing of the joint space involving the medial compartment bilaterally. There is no associated sclerosis of the involved endplates or osteophyte formation to suggest more advanced degenerative changes. The alignment of the bone structures of both knees is normal. There is no evidence of fracture. There is no evidence of a suprapa-

tellar joint effusion. The bone density and the soft tissues are normal.

Tr. 190.

Dr. Kyriakides interpreted the x-rays of the lumbar spine as follows:

The alignment of the five lumbar type vertebral bodies is normal. There is no evidence of spondylolysis or spondylolisthesis. There is decreased intervertebral disc space at L1–2 and L5–S1. There are small osteophytes at the anterior surface of the involved vertebral endplates at L1–2. There are also degenerative changes in the lower thoracic spine. The bone density is within normal limits.

Tr. 191.

As to the cervical spine, Dr. Kyriakides stated:

On the lateral view the examination of C7 is limited due to overlapping of soft tissues. The alignment of the first six cervical vertebral bodies is normal. The anterior, posterior, and spinal lamina lines are intact. The intervertebral disk spaces are normal. There was no evidence of neural foraminal narrowing bilaterally. The odontoid is normal in the open mouth view.

Tr. 192.

With respect to the right shoulder, Dr. Kyriakides found:

The alignment of the bones in the right shoulder is normal. There is no evidence of fracture or dislocation. The joint space is well preserved. Bone density is normal. There is a small osteophyte in the inferior aspect of the distal clavicle. The subacromial space is normal.

Tr. 193.

As to the left shoulder, Dr. Kyriakides stated:

. . . normal alignment in the bony structures of the left shoulder, also. There is

no evidence of fracture or dislocation and the bone density is normal. The subacromial space is normal.

*Id.*

On September 12, 2000, the same date that plaintiff saw Dr. Huskey and had the x-rays taken, plaintiff visited VA mental health. Tr. 187–89. William E. Rinck, M.D., staff psychiatrist, described the following mental status:

Patient pleasant but seems very frustrated. Feels nobody understands his problems. Blames himself partly, for his inability to describe [his condition] adequately. Ambivalent self image. Appears depressed and anxious. [Strongly] denies any suicidal feelings. Speech unpressured and goal-[directed]. No thought disorder. 0X4 ok, but probably does have some [defects] of recent memory. Recalled vice president's name with difficulty and the name of the two presidential contenders were very difficult for him to recall.

Tr. 187. Dr. Rinck diagnosed depression and prescribed anti-depressant medication.[4] Tr. 189.

On September 28, 2000, Asghar M. Chaudhary, M.D., F.A.C.P., examined plaintiff. Tr. 201–204. Plaintiff reported a five-year history of pain in his neck, knees and shoulders. Plaintiff also reported short-term memory loss since his accident. Dr. Chaudhary noted that plaintiff was not well oriented, was somewhat confused, and had difficulty getting on and off the examining table. Tr. 201. Dr. Chaudhary made the following diagnostic impression:

1. Sprain, both hips and low back pain, possibly secondary to degenerative arthritis, etiology undermined

2. Pain in both knees, possibly secondary to degenerative arthritis

3. Pain and limitation of right shoulder, possibly secondary to frozen shoulder or capsulitis

4. Short term memory loss, etiology undetermined, possibly secondary to trauma

5. Status post trauma by a truck about a year ago

6. Depression, per history

7. Disorganization, loss of recent memory, etiology undetermined

8. History of smoking

9. Tobaccoism, per history

Tr. 203.

A lumbar spine x-ray taken on September 28, 2000 revealed "[d]egenerative disc disease in the lower thoracic spine and L1–2 levels" and "equivocal mild compression deformity in the anterior aspect of T12." Tr. 205.

On October 18, 2000, a doctor completed a physical residual functional capacity assessment for plaintiff.[5] Tr. 206–13. The doctor opined that plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. Tr. 207. In an eight-hour work day, the doctor reported that plaintiff should stand and/or walk for two hours and sit for six hours. Tr. 207. The doctor stated that plaintiff should never climb because of his shoulder and should avoid frequent crouching because of lumbar spine disease. Tr. 208. Otherwise, the doctor prescribed no restrictions regarding balancing, stooping, kneeling and crawling. *Id.* The doctor found no established visual limitations. Tr. 209.[6]

---

**4.** The type of medication is not legible. *See* Tr. 189.

**5.** The name of the doctor is not legible. *See* Tr. 213.

**6.** The doctor made additional hand-written notes which are not legible. *See* Tr. 213.

On February 9, 2001, Dr. Rinck noted a "strange" call from plaintiff. Tr. 259. Plaintiff's speech was slurred, and he seemed angry and intoxicated. *Id.* Plaintiff asked why Dr. Rinck had not returned his call, of which Dr. Rinck was unaware. *Id.* Plaintiff said that his headaches and dizziness continued and that he stopped taking the anti-depression medicine because it did not work. *Id.*

On February 10, 2001, psychologist Howard J. Birky, Ph.D., examined plaintiff. Tr. 214–17. Plaintiff reported that since his accident, he had suffered periodic dizziness, confusion and headaches. Tr. 214. Plaintiff reported memory problems but denied having seizures or blackouts. Tr. 215. Dr. Birky judged that plaintiff's intellectual functioning was in the low average range. Tr. 215–16. Mental health professionals use Axis I to report all the various mental disorders except for personality disorders and mental retardation; Axis II for personality disorders and mental retardation; Axis III for general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder; Axis IV for psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders; and Axis V for the individual's global assessment of functioning ("GAF"). *See Diagnostic & Statistical Manual Of Mental Disorders ("DSM–IV")* (4th ed.1994) at 25–30. Using that protocol, Dr. Birky made the following diagnostic impression of plaintiff:

Axis I: 309.0, Adjustment Disorder with Depressed Mood, Chronic 305.00, Alcohol Abuse, by history

Axis II: V71.09, No Diagnosis

Axis III: Not assessed

Axis IV: Psychosocial and Environmental Problems: Difficulty adjusting to medical realities

Axis V: Current GAF = 60; Highest Past Year GAF = 60.

Tr. 217.

On February 20, 2001, plaintiff visited a VA nurse practitioner complaining of increased headaches. Tr. 257. Plaintiff reported that he had struck himself in the head while trying to pull up a fence post. *Id.* Plaintiff reported changes in his memory, stating that he was getting lost easily in his home town. *Id.* Plaintiff also complained of pain in his right shoulder, hips and knees. *Id.* The nurse prescribed acetaminophen and tramadol as needed and citalopram hydrobromide daily for depression. *Id.*

On February 21, 2001, psychologist David O. Hill, Ph.D., assessed plaintiff's residual functional capacity. Tr. 218–21. Dr. Hill found that plaintiff was moderately limited in the abilities to (1) understand, remember and carry out detailed instructions and (2) maintain attention and concentration for extended periods. Tr. 218. Dr. Hill opined that plaintiff

retains sufficient M–RFC for competitive employment. His episodes of disorientation and confusion will produce a moderate limitation in his ability to maintain his attention and concentration. There is also probably some limitation in his ability to remember and carry out complex instructions. However, Dr. Birky's observations along with the objective testing and the self-description in the ADLS indicate that he retains sufficient M–RFC for competitive work.

Tr. 222.

On May 18, 2001, plaintiff visited VA rehabilitation medicine for pain in the right shoulder and arm, with numbness and tingling in the right arm and generalized weakness. Tr. 254–55. Plaintiff also reported low back pain and numbness and tingling in the left lower extremity, which he said had begun about one and a half

years ago. Tr. 254. George Varghese, M.D., staff physician, examined plaintiff and made the following impression:

1. Essentially normal electrophysiologic studies (a few positive waves seen in the abductor policis brevis which was the only abnormal finding[) ].

2. There was no evidence of right cervical radiculopathy, left lumbosarcral radiculopathy or any evidence of peripheral neuropathy.

Tr. 255.

On June 13, 2001, plaintiff presented to VA orthopedics for pain in the right shoulder, low back and knees. Tr. 252–53. Plaintiff reported that he could not lift his right arm above his shoulder. Tr. 252. Karen M. Koupal, physician assistant, made the following impression:

1. Adhesive capsulitis of the right shoulder.

2. Very mild degenerative changes in both knees.

3. Degenerative disk disease of his lumbosacral spine.

Tr. 253. Ms. Koupal recommended that plaintiff undergo occupational therapy for range of motion in his right shoulder. She also requested a lumbosacral corset for him, prescribed a non-steroid salsalate and asked plaintiff to return in six months.

On December 11, 2001, plaintiff returned to VA orthopedics with pain in the knees, hips, low back, neck and shoulder. Tr. 247. Plaintiff reported that wearing his back brace caused pain in his hips. *Id.* Plaintiff also stated that the salsalate had not provided significant relief in his knees. *Id.* Thomas M. Atteberry, resident in orthopedic surgery, assessed plaintiff as follows: [7]

1. Bilateral greater trochanteric bursitis.

2. Mild degenerative joint disease bilateral knees.

3. Degenerative disk disease lumbar spine.

*Id.* Atteberry noted that plaintiff was scheduled to see neurosurgery regarding back and shoulder pain. *Id.* He injected steroids in plaintiff's knees and recommended that plaintiff continue with anti-inflammatory medicine. *Id.* Atteberry planned for plaintiff to return in six months. *Id.*

On January 16, 2002, plaintiff returned to Dr. Rinck for depression. Tr. 246. Plaintiff reported that he had stopped the anti-depressant medication and resumed it. *Id.* Dr. Rinck noted that plaintiff was taking citalopram, acetaminophen, cabapentin and salsalate and did not change the prescription. *Id.*

On February 19, 2002, plaintiff visited VA neurology for headaches. Tr. 243. Plaintiff reported that occasional headaches had begun after a head injury in 1999 and increased to daily over the past two years. *Id.* Plaintiff reported some relief with Tylenol and gabapentin. *Id.* Plaintiff stated that after his head injury he began having "seizures" during which he was disoriented and sometimes fell down. *Id.* Plaintiff stated that he remains conscious during the seizures but does not remember them. *Id.* Plaintiff reported a "funny sensation" before the episodes and that they usually occurred with social anxiety, about two to four times a month. *Id.* Plaintiff that he had curbed his driving because of seizures. *Id.* Heather S. Anderson, M.D., prescribed depakote ER 500 mg for headaches and ordered an EEG with hyperventilation output to assess plaintiff's seizures. Tr. 244–45. Dr. Anderson asked plaintiff to return to neurology in three to four months. Tr. 245.

---

7. The record does not indicate whether Atteberry is a medical doctor. *See* Tr. 247.

On March 1, 2002, plaintiff had an EEG reading. Tr. 241–42. Louis T. Giron, Jr., M.D., reported:

Normal electroencephalogram, awake, with T1 and T2 as well as lower circumferential array of electrodes.

The absence of epileptiform activity in the present recording does not exclude the clinical diagnosis of seizure disorder. Because of the absence of drowsiness and sleep in the present recording another recording will be requested with the patient in the sleep-deprived state.

*Id.*

On June 11, 2002, plaintiff returned to VA orthopedics, reporting pain in his knees, lowback, groin and buttocks with no relief from aspirin, Motrin or salsalate. Tr. 261. Plaintiff also reported numbness in his entire left lower extremity. *Id.* Kimberly Templeton, M.D., noted that plain films of the spine six months ago indicated that plaintiff had diffuse arthritic changes. *Id.* Dr. Templeton ordered x-rays of plaintiff's hips, which showed osteophytes of both hips. *Id.* Dr. Templeton noted that the joint spaces were well maintained and that plaintiff had subchondral cysts in the left hip. *Id.* Dr. Templeton advised plaintiff that his primary problem was diffuse osteoarthritis, with secondary trochanteric bursitis. *Id.* Dr. Templeton expressed concerned about the numbness in plaintiff's left lower extremity. *Id.* She stated that she would like to repeat electromyogram and nerve conduction studies to confirm that plaintiff did not have a neurological problem. *Id.*

On July 10, 2002, plaintiff underwent an electroencephalogram recording in a sleep-deprived state, which revealed the following:

Abnormal electroencephalogram, awake and asleep, with T1 and T2 electrodes as well as a lower circumferential array of electrodes, sleep-deprived. This recording is abnormal because of:

1. Singlet sharp waves arising simultaneously from T1 and T9 locations.

2. Episodes of rhythmic, moderate-voltage alpha activity arising primarily from the left temporal regions.

Tr. 264–65. Louis T. Giron, team leader of VA neurology, noted:

The first abnormalities are consistent with interictal [8] discharges arising from the left anterotemporal and left inferotemporal regions. Cause cannot be determined from this recording alone and focal vascular disease and head trauma, as well as space-taking lesions, are in the differential diagnosis.

The second group of abnormalities is of undetermined clinical significance. It suggests, but only suggests, a tendency towards paroxysmal [9] activity arising from this location.

Tr. 265. Dr. Giron observed that "[s]ince the initial recording of March of this year, and perhaps because of sleep-deprivation, epileptiform [10] abnormalities are now evident." *Id.*

---

8. "Interictal" refers to the period between convulsions. *See Stedman's Medical Dictionary* (26th ed.1995) at 912.

9. "Paroxysmal" relates to a sharp spasm or convulsion. *See Stedman's Medical Dictionary* at 1318.

10. Epileptiform refers to "[r]esembling epilepsy; denoting certain convulsions, especial-

ly of functional nature." *Stedman's Medical Dictionary* at 607.

"Epilepsy" means "[a] chronic disorder characterized by paroxysmal brain dysfunction due to excessive neuronal discharge, and usually associated with some alteration of consciousness." *Id.* at 605.

## D. Vocational Expert

The Commissioner retained George Robert McClellan to testify as a vocational expert. The Commissioner asked McClellan to consider the following hypothetical:

assume we have a hypothetical claimant of the same age, education, and work experience as James Folsorn, who has the residual functional capacity to perform light work, no more than occasional bending, twisting, squatting, or climbing, simple repetitive tasks only, and I'm going to say that he has essentially monocular vision ... which ... will restrict him as far as working with dangerous machinery, it might restrict his depth perception.

Tr. 64–65. Based on this hypothetical, McClellan testified that plaintiff could perform light duty jobs such as mail sorter, microfilm or duplicating machine operator, gate and building guard. Tr. 66. McClellan opined that for each job about 40,000 to 90,000 positions existed nationally with 1,500 located in Kansas. Tr. 65. McClellan also testified that each position has an opportunity to sit and stand. *Id.*

The Commissioner asked McClellan to consider the same hypothetical with a requirement for sedentary work. *Id.* Based on this hypothetical, McClellan testified that plaintiff could work as a clerical sorter, production line assembler and production line inspector. Tr. 65–66. McClellan opined that 20,000 sedentary assembler and inspector jobs exist nationally with 1,200 located in Kansas, and 90,000 clerical sorter jobs exist nationally with 2,000 located in Kansas. Tr. 66. McClellan testified that all of the jobs had an opportunity to sit and stand. *Id.*

Plaintiff's attorney asked McClellan to consider the same hypothetical with "moderate difficulty even maintaining concentration, persistence, or pace." Tr. 67. McClellan testified that assuming that "moderate" meant a third of the time,

plaintiff could not perform any work in the national economy. *Id.*

## III. ALJ's Findings

The ALJ made the following findings:

1. Claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. Claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. Claimant has the following "severe" impairments: diffuse degenerative disc disease and degenerative joint disease of the cervical and lumbar spine without evidence of spinal canal senosis or foraminal stenosis; probable seizure disorder; headaches and alleged memory problems with low average IQ and borderline to average memory; depression NOS; monocular vision since 4th or 5th grade; and alcohol consumption, probably in remission.

4. Claimant's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, subpart P, Regulation No. 4.

5. The undersigned finds the allegations and testimony of claimant and his wife regarding claimant's limitations are not totally credible for the reasons set forth in the body of this decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7. Claimant has the following residual functional capacity: light work doing simple, repetitive tasks, with only occasional bending, twisting, squatting, and climbing, and he has bad depth perception as a result of monocular vision. Claimant's mental residual functional capacity causes no restriction of activities of daily living, slight difficulties in maintaining social functioning as seen in his daily activities questionnaire, moderate difficulties in maintaining concentration, restricting him to the performance of simple repetitive tasks, and no extended periods of decompensation of extended duration.

8. Claimant is unable to perform any of his past relevant work (10 CFR §§ 404.1565 and 416.965).

9. Claimant is a "younger" individual.

10. Claimant has a "high school" education (20 CFR §§ 404.1564 and 416.964).

11. Claimant's past work was unskilled. Thus, transferability of skills is not an issue in this case. (20 CFR §§ 404.1568 and 416.968).

12. Considering claimant's vocational profile and above-described residual functional capacity, he can perform light and sedentary jobs that exist in significant numbers in the national economy. This finding is based on vocational expert testimony.

13. Claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

Tr. 22–23.

**IV. Standard of Review**

The ALJ's decision is binding on the Court if supported by substantial evidence.

*See* 42 U.S.C. § 405(g); *Dixon v. Heckler,* 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *See Castellano v. Sec'y of HHS,* 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Court must scrutinize the record and take into account any evidence which fairly detracts from the evidence which supports the Secretary's findings. *See Nieto v. Heckler,* 750 F.2d 59 (10th Cir.1984). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler,* 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir. 1983)).

**V. Analysis**

 Plaintiff claims that the ALJ erred by discounting his credibility and not including his seizure disorder in the hypothetical questions to the vocational expert. Plaintiff bears the burden of proving disability under the SSA. *See Henrie v. United States Dep't of HHS,* 13 F.3d 359, 360 (10th Cir.1993); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. *See* 42 U.S.C.A. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a

severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. *See* 20 C.F.R. §§ 404.1520, 416.920 (1996). If a claimant satisfies steps one, two and three, he is disabled; if a claimant satisfies steps one and two, but not three, then he must satisfy step four. If he satisfies step four, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. *See Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir.1988). In this case, the ALJ denied benefits at step five, finding that although plaintiff's impairments prevent him from performing past relevant work, he is capable of performing other jobs which exist in significant numbers in the national economy. Tr. 22.

### A. Credibility Determination

Plaintiff asserts that the ALJ should not have discounted his subjective complaints, particularly with respect to seizures. With respect to credibility, the ALJ stated:

> Claimant's allegations, including subjective complaints of pain, are not credible in light of his daily activities, discrepancies between the claimant's assertions and information contained in the documentary reports, the reports of treating and examining practitioners, his lack of need for ongoing medical [sic] until a year after his alleged disability onset date, and although he alleges significant, [sic] pain, only needs mild or over-the-counter medication to control his symptoms.

Tr. 19. To support her determination, the ALJ discussed plaintiff's daily activities and medical evidence regarding pain, but not seizures. *See* Tr. 19–21.

The Tenth Circuit has set forth the following factors for analyzing subjective complaints of disabling conditions: (1) whether claimant proves with objective medical evidence an impairment that causes the subjective condition; (2) whether a loose nexus exists between the impairment and the subjective condition; and (3) whether the subjective condition is disabling based upon all objective and subjective evidence. *See Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994); *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987). If plaintiff satisfies the first two factors, the ALJ must consider plaintiff's assertions regarding subjective conditions and decide whether she believes them. *See Luna,* 834 F.2d at 163. In determining the credibility of plaintiff's testimony, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony with objective medical evidence.

*Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir.1988).

In reviewing the credibility determination, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of HHS,* 933 F.2d 799, 801 (10th Cir.1991). Credibility is the province of the ALJ. *Hamilton v. Sec'y of HHS,* 961 F.2d 1495, 1499 (10th Cir.1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are

not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995). *But see Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir.2000) (*Kepler* does not require formalistic factor-by-factor recitation of evidence). Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. *Kepler,* 68 F.3d at 391 (quoting *Huston,* 838 F.2d at 1133) (footnote omitted). In making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements. *See* Social Security Ruling 96-7p, 61 Fed.Reg. at 34486. Rather, the ALJ "may find all, only some, or none of an individual's allegations to be credible." *See id.*

With respect to plaintiff's subjective complaints of pain, the ALJ adequately explained her decision to discount plaintiff's credibility based on specific evidence relevant to each factor. *See Barnett v. Apfel,* 231 F.3d 687, 690 (10th Cir.2000); *Huston,* 838 F.2d at 1132; *Kepler,* 68 F.3d at 391. The Court therefore defers to the ALJ determination regarding plaintiff's credibility with respect to subjective complaints of pain.

■ The ALJ failed to discuss whether she discounted plaintiff's credibility regarding seizures and, if so, based on what evidence. The medical records indicate that plaintiff first complained of seizures in February of 2002, when he reported having seizures about two to four times a month.[11] *See* Tr. 243. About five months later, on July 10, 2002, an electroencephalogram showed abnormalities which resembled epileptic-like convulsions. *See* Tr. 265. Twenty days later, at the hearing on July 30, 2002, plaintiff estimated that he had seizures about two times a day. *See* Tr. 48. In addition, plaintiff's wife testified that she observed plaintiff having seizures about three times a week. Tr. 60. The ALJ found that plaintiff had "probable seizure disorder," *see* Tr. 15, yet she did not determine plaintiff's credibility with respect to seizures, the frequency of any seizures and whether they impact plaintiff's ability to work. The Court therefore remands the case for further findings regarding plaintiff's credibility in that regard.

**B. Hypothetical Question To Vocational Expert**

■ Plaintiff asserts that the ALJ erred in not including his seizure disorder in the hypothetical questions to the vocational expert. The Court agrees. The ALJ found that plaintiff suffered from "probable seizure disorder" yet her hypothetical questions to the vocational expert did not account for seizures.[12] Hypothetical questions must include a full description of a claimant's impairments in order for the testimony elicited by such questions to constitute substantial evidence to support the ALJ's decision. *See Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991). In formulating the hypothetical question, however, the ALJ need not include any alleged limitations which she does not accept as true. *See Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985). Rather, the ALJ may restrict her hypothetical to those limitations which she has found to exist based upon substantial evidence in the record. *See Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir.1993).

---

**11.** A year earlier, on February 10, 2001, plaintiff denied having seizures. *See* Tr. 215.

**12.** The hypothetical questions focused primarily on physical restrictions and assumed that plaintiff could perform only simple repetitive tasks. *See* Tr. 64-65. The latter requirement apparently stems from Dr. Hill's psychological assessment on February 21, 2001, which occurred nearly a year before plaintiff first complained of seizures. *See* Tr. 218-21.

Here, the ALJ did not determine the credibility of plaintiff's complaints regarding seizures, the frequency of any seizures and whether they impact plaintiff's ability to work.[13] On remand, the ALJ should consider these factors and include in the hypothetical questions to the vocational expert any limitations which she finds to exist.

**IT IS THEREFORE ORDERED** that plaintiff's *Motion For Judgment* (Doc. # 5) filed November 21, 2001 be and hereby is **SUSTAINED in part**. This case is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.

---

**13.** The ALJ has a duty to fully develop the record in this regard. *See Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir.1993).